EXHIBIT A

1          UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF WASHINGTON

3                 AT SEATTLE

   _____

4

   ARMEN BEEMAN, a single          )

5  individual,                     )
                                   )

6              Plaintiff(s),       )
                                   )

7       vs.                        )  2:19-cv-00924-RSM
                                   )

8  CITY OF SEDRO WOOLLEY,          )
                                   )

9              Defendant(s).       )

   _____

10

    Video Recorded Deposition Upon Oral Examination of

11

                 ARMEN BEEMAN

12 _____

13

14                 9:58 a.m.

15              March 10, 2020

16       2100 Westlake Avenue North, Suite 206

17               Seattle, Washington

18

19

20

21

22

23

24  REPORTED BY:  Mindi L. Pettit, RPR, CCR #2519

25

                                        Page 1

10am Armen Beeman - March 10, 2020

```
1                    A P P E A R A N C E S

2

3      For the Plaintiff:

4              RODNEY R. MOODY, ESQ.

5              Attorney at Law

6              2707 Colby Avenue, Suite 603

7              Everett, Washington 98201

8              (425) 740-2940

9              rmoody@rodneymoodylaw.com

10

11     For the Defendant:

12             ZACHARY B. PARKER, ESQ.

13             THOMAS P. MILLER, ESQ.

14             Christie Law Group, PLLC

15             2100 Westlake Avenue North, Suite 206

16             Seattle, Washington 98109

17             (206) 957-9669

18             zach@christielawgroup.com

19             tom@christielawgroup.com

20

21     Also Present:  Joel Aaron Wright, Veritext Corporation

22

23

24

25

                                              Page  2
```

10am Armen Beeman - March 10, 2020

```
1                         I N D E X

2

3     EXAMINATION BY:                          PAGE(S)

4     MR. PARKER                                  5

5

6

7

8

9

10    EXHIBITS FOR IDENTIFICATION               PAGE

11     Exhibit 1    Detail Incident Report of Officer    50

12                  Hannawalt, 4-11-17

13     Exhibit 2    Detail Incident Report of Officer    50

14                  Carroll, 4-11-17

15     Exhibit 3    Thumb drive                          50

16     Exhibit 4    Complaint for Damages                50

17

18

19

20

21

22

23

24

25
```

YOM: Full Service Court Reporting, A Veritext Company
800.831.6973

1     Seattle, Washington; March 10, 2020

2       9:58 a.m.

3       --oOo--

4     THE VIDEOGRAPHER:  Good morning.  We're

5 on the record.  The time is 9:58 a.m.  Here begins

6 Volume 1, Media Unit No. 1, in the testimony of Armen

7 Beeman in the matter of Armen Beeman versus City of

8 Sedro-Woolley for the Superior Court of the State of

9 Washington in and for the County of King, Case

10 No. 2:19-cv-00924-RSM.

11     Today's date is March 10th, 2020.  My name is

12 Joel Wright with YOM Veritext corporation.  This video

13 deposition is taking place at the offices of Christie

14 Law Group located at 2100 Westlake Avenue North, Suite

15 206, and was noticed by counsel for the defendant.

16     Counsel, please identify yourselves and state

17 whom you represent.

18      MR. MOODY:  Rod Moody.  I represent the

19 plaintiff in this matter, Armen Beeman.

20      MR. PARKER:  Zach Parker.  I represent

21 the defendant, City of Sedro-Woolley.

22      MR. MILLER:  Tom Miller also for

23 Sedro-Woolley.

24     THE VIDEOGRAPHER:  The court reporter

25 today is Mindi Pettit with YOM Veritext corporation.

                  Page  4

10am Armen Beeman - March 10, 2020

```
 1              Will the court reporter please administer the
 2    oath.
 3                        ARMEN BEEMAN,
 4        sworn as a witness by the Certified Court Reporter,
 5                    testified as follows:
 6                        EXAMINATION
 7     BY MR. PARKER:
 8        Q.  Good morning, Mr. Beeman.  We met off the
 9    record.  My name is Zachary Parker, and again, I
10    represent the City of Sedro-Woolley in this matter.
11    Can you state and spell your name for the record.
12        A.  My name is Armen Beeman, spelled A-r-m-e-n,
13    B-e-e-m-a-n.
14        Q.  And have you had your deposition taken before?
15        A.  No.  I've done an investigation inquiry that
16    was similar, but no, I have not done a deposition.
17        Q.  Okay.  I'll go over the basics.  It's
18    essentially a formal interview where I ask questions;
19    you answer them.  The court reporter takes everything
20    down.  Because she's taking everything down, we need to
21    be good that I finish my question and then you answer,
22    and vice versa, I'll try not to talk over you as well.
23        A.  (Nodding.)
24        Q.  Along with that, we need audible answers, so
25    no um-hums or nods of your head.  We need affirmative
```

                                                      Page 5

10am Armen Beeman - March 10, 2020

1      A.   Immigration law, vehicle stops, the

2   differences, you know, between felony stops, firearms

3   training -- things of that nature.

4      Q.   And who put on the classes?

5      A.   The US Border Patrol.

6      Q.   In New Mexico, you said?

7      A.   Yes, sir.

8      Q.   And in your current role with the asphalt

9   company, what -- what does your job consist of?

10     A.   I drive a -- I have a commercial driver's

11  license and drive a dump truck.

12     Q.   Okay.  Where were you employed on April

13  10th -- this is the day before the -- the incident that

14  this lawsuit's around -- on April 10th, 2016?

15     A.   The US Border Patrol station at Sumas,

16  Washington.

17     Q.   Okay.  And what were your job duties?

18     A.   Patrol and monitor the border, looking for

19  signs of illegal entry or -- of both persons and goods

20  and materials.

21     Q.   And when did you start working there?

22     A.   In December of 2010, I believe.

23     Q.   And when -- when did you stop working there?

24     A.   December 19th, 2017, I believe.

25     Q.   '17, okay.  Was honesty a -- a big part of

                                        Page 10

10am Armen Beeman - March 10, 2020

1   that job?

2          A.   Of course.

3          Q.   And if you engaged in an act of dishonesty,

4    would you be subsequently fired from that job?

5          A.   It was a potential outcome.

6          Q.   And why do you say "potential"?

7          A.   I don't know that it occurred in every

8    instance on every matter, but we were obviously taught

9    that if it was a lie and if it was something where you

10   were no longer considered to be honest and you couldn't

11   be relied upon in testimony, that then you could no

12   longer be called as a reliable witness.

13         Q.   And why did you leave that job in December of

14   2017?

15         A.   The border patrol fired me.   They terminated

16   me based on the determination that was stemming from

17   this event.

18         Q.   Can you explain that further.

19         A.   The -- the border patrol made a determination

20   to terminate me based on what happened on the morning

21   of April 11th, 2016.   And because of that, they made

22   the decision to terminate me.

23         Q.   And did they tell you that?   Is that -- who

24   told you that?

25         A.   I believe Deputy Chief Halliday was the one

                                              Page 11

1   who -- I was brought into an office -- who delivered

2   that news to me.

3       Q.   And what did he say?

4       A.   He said that, according to the last chance

5   agreement, that you will -- that you have -- you are

6   terminated and that you have no rights to appeal that

7   decision or anything further.   And so you'll be

8   escorted to your locker to get your things and -- and

9   removed from the building.

10      Q.   And in that meeting, did he give the reasons

11  behind the decision to terminate you?

12      A.   No, sir.

13      Q.   So, earlier when you explained that you -- is

14  it that you believe the April 11th -- the incident on

15  April 11th with the Sedro-Woolley Police Department is

16  the reason?

17      A.   No, it was specifically cited.

18      Q.   Oh, in -- in a document?

19      A.   Yes, sir.

20      Q.   Oh, okay.   And when --

21      A.   I believe, yes, sir.   That's my -- that's -- I

22  believe I have that document or that . . .

23      Q.   And how did that come into place?

24      A.   That was what I was presented with.

25      Q.   A document listing that this -- that this

Page 12

10am Armen Beeman - March 10, 2020

1   April 11th incident is the basis for their -- your

2   termination?

3       A.   Yes, because of the determination to terminate

4   from the Sedro-Woolley event -- that that was being

5   enacted and that was what I was being terminated . . .

6       Q.   You -- you mentioned a last chance agreement?

7       A.   Um-hum.

8       Q.   What is that?

9       A.   They made the decision to terminate me, and

10  once they made that decision, I then had an opportunity

11  to appeal that decision.  I appealed that decision.  It

12  was a verbal appeal with the determine -- the deciding

13  official, Chief Chris Bippley.

14          And once I got through that phase, then they

15  put forward a decision to terminate -- a

16  determination -- sorry, a determination letter with a

17  decision to terminate.

18          It included a last chance agreement, which was

19  if I was willing to forgo any union rights to appeal,

20  which -- if I was willing to forgo any union rights to

21  appeal this decision and I signed it, I would sign a

22  third -- I would serve a 30-day unpaid suspension.

23          And then for two years, I would have to keep a

24  clean record of conduct.  And if I didn't sign it, I

25  would be terminated immediately based on the decision

Page 13

10am Armen Beeman - March 10, 2020

1    to terminate from Sedro-Woolley.

2         Because of the financial hardship that this

3    had put me under, with reduced income and just the cost

4    of fighting it through the -- through the criminal

5    courts.  And I was going through a divorce at the time

6    and so the expenses of that.

7         I was put in a situation where my choices were

8    either to be immediately terminated and hope that the

9    union would be able to appeal it -- and the waiting

10   list for the union to work its way through appeals was

11   anywhere from one to two years.  Nobody could give me

12   any time frame.  So my choices were I was either

13   terminated immediately or I could sign this agreement

14   and hope to retain my job and not have any future

15   issues.

16        So I served the 30-day suspension.  And then

17   the week that I came back to work, the border patrol

18   made an accusation that I had already violated it and

19   then resurrected the determination from the City of

20   Sedro-Woolley event and that was the grounds for

21   terminating me.

22        Q.  And I just want to understand the time line.

23   It sounds like your -- your last day -- or this -- the

24   date you were officially terminated --

25        A.  Um-hum.

                                            Page 14

10am Armen Beeman - March 10, 2020

1    Q.   -- was in December of 2017?

2    A.   Yes, sir.

3    Q.   And can you explain just --

4    A.   I may be -- I apologize.   If you have notes on

5    it, you might be able to find whether it's 2017 or

6    2018.   I apologize.   It was right before the new year,

7    so I've lost -- I'm not -- right now, I'm not correctly

8    remembering, so . . .

9    Q.   And that's okay.   I just want to understand

10   the series of events, and if you can just kind of

11   estimate when they occurred, that's -- that's okay.

12   A.   Okay.

13   Q.   So it sounds as though your superiors came to

14   you.   What was the first event that led to your

15   termination?

16   A.   The first event was the arrest by the City of

17   Sedro-Woolley that, at the very end of August or the

18   very start of September, came back with a decision to

19   terminate with the last chance agreement.

20   Q.   In what year?

21   A.   2017.

22   Q.   2017?

23   A.   The same year I was terminated, yes, sir.

24   Q.   Okay.   And then what did you do?

25   A.   Then I accepted the last chance agreement in

Page 15

1   an attempt to save my job.  And then I served a 30-day

2   suspension, from approximately September 10th to

3   October 10th.  And then that week that I came back,

4   somewhere around the 15th, the border patrol said you

5   violated the last chance agreement.  And it took them

6   until December to terminate me.

7          Q.   Okay.  And what did they allege you did to

8   violate the last chance agreement?

9          A.   They made the allegation that I improperly

10  accessed fuel -- gas in order to fuel the pressure

11  washer to wash the station, which is what I was doing

12  while I was on administrative duties because of the

13  Sedro-Woolley event.

14         Q.   So ultimately the basis for them finding that

15  you violated the last chance agreement and terminate --

16  and them terminating you was that you violated the last

17  chance -- that they alleged that you violated the last

18  chance agreement by improperly fueling the pressure

19  washer?

20         A.   Yes.

21         Q.   Oh, okay.  I misunderstood.  Earlier I thought

22  it was the Sedro-Woolley event.  But the Sedro-Woolley

23  event, it sounded like, was the first -- that -- that

24  led to the last chance agreement, and then you were

25  reinstated in a certain capacity with customs and

                                              Page 16

10am Armen Beeman - March 10, 2020

1  border patrol?

2       A.   It is my belief now that the border patrol

3  used the Sedro-Woolley event to put me in a spot where

4  I signed away my rights to union representation.   And

5  once I had done that, then they terminated me.   That

6  there was -- there was no cause, other than the City of

7  Sedro-Woolley event.   And then them finding a way to

8  terminate me without me having a way to fight it.

9       Q.   And that is your belief, but not what they

10  represented to you?

11       A.   Correct.

12       Q.   Okay.   This last chance agreement, was that --

13  strike that.

14            Was the last chance agreement something that

15  was in place on April 11th, 2016?

16       A.   No, sir.

17       Q.   It -- it was simply a part of the employment

18  action that they took against you in terminating you?

19  That was very poorly worded.   I apologize.   You did not

20  have this last chance agreement until roughly September

21  of 2017?

22       A.   Correct.

23       Q.   Okay.   Thank you.   Did you receive a -- any

24  sort of writing, email or otherwise, by the customs and

25  border patrol indicating that they were ultimately

10am Armen Beeman - March 10, 2020

1    terminating you for violation of the last chance

2    agreement due to this improper fueling?

3         A.   I believe the effect of the letter is, we are

4    alleging that this improper access of fuel violates the

5    last chance agreement.   And the last chance agreement

6    is that there be nothing -- or we are exercising the

7    determination made from the April 11th Sedro-Woolley

8    event.

9         Q.   Had you previously received any disciplinary

10   action while you were working for customs and border

11   patrol?

12        A.   Yes, sir.

13        Q.   Can you explain what those -- what those

14   events were.

15        A.   In July of 2014, I dropped my motorcycle on my

16   ankle and broke it.   And through a series of events,

17   several hours later, an officer came to the emergency

18   room that I was at and put me through the process of a

19   DUI investigation.

20             The DUI investigation was later dropped.   And

21   I did end up pleading guilty to a traffic infraction

22   for failure to control my vehicle.   And I believe that

23   carried like a $500 fine -- something like that.

24             And so I served -- that was a conduct

25   unbecoming investigation with the border patrol.   And

Page 18

10am Armen Beeman - March 10, 2020

1    that resulted in a three-day suspension.

2         Q.   And when you say "traffic infraction," was

3    that a municipal infraction or something within customs

4    and border patrol?

5         A.   Municipal.

6         Q.   Okay.

7         A.   Municipal, yes, sir.

8         Q.   Okay.   Any other disciplinary actions?

9         A.   I believe it's not supposed to be part of the

10   record any longer, but I did injure my head at the

11   basic training academy and received a written reprimand

12   about off-duty behavior.

13        Q.   And were you driving under the influence of

14   alcohol or narcotics when you dropped your motorcycle?

15        A.   No, sir.

16        Q.   Okay.   Any other disciplinary actions?

17        A.   I don't believe any of them -- I -- there are

18   little educational opportunities along the way.   I

19   don't believe they are considered disciplinary actions,

20   so I don't believe that there are any others.

21        Q.   So just the motorcycle and the event at basic

22   training?

23        A.   Yes, sir.

24        Q.   Okay.   The -- the -- taking one step back, why

25   do you believe that the April 11th Sedro-Woolley event

                                                    Page 19

1  was the original basis for them taking disciplinary

2  action against you in roughly September of 2017?

3       A.  Well, I think it's pretty clear that when a --

4  a determination to terminate is made and you put a

5  person in a position of you either accept a last chance

6  agreement or you're terminated from a job that pays six

7  figures a year and that person has bills and, you know,

8  kids to support and things like that.

9           And then within days of coming back from that

10 suspension, that that same determination -- that

11 decision to terminate is enacted, that it's pretty

12 clear that the person never had a fair chance or, you

13 know, stood a fair shake at moving forward with their

14 life.

15      Q.  And my question was just slightly different.

16 That first action taken against you in 2017 --

17      A.  Um-hum.

18      Q.  -- I believe you said September -- what were

19 you told what -- how do you come to the conclusion that

20 what happened in April of 2016 with the Sedro-Woolley

21 Police Department -- that was the basis of their action

22 taken against you?

23      A.  I'm still confused by what you're saying.

24      Q.  I apologize.  Did anyone represent to you that

25 what happened with Sedro-Woolley Police Department is

                                             Page 20

10am Armen Beeman - March 10, 2020

1    the reason they were originally taking steps -- adverse

2    steps against your employment?

3         A.   Yes.

4         Q.   Okay.   And who did that?

5         A.   The moment that you have an interaction with a

6    police officer, we are required to report that to the

7    border patrol.   So, whether the officers that night had

8    contacted my supervisors, I would have had to.   That

9    begins a conduct unbecoming investigation.   And so

10   simultaneously, while the criminal case was moving

11   forward, a conduct unbecoming investigation was going

12   on.

13        I believe you probably have notes about an

14   Agent Simpson and a Special Agent Nicholson in -- that

15   are sporadically throughout the materials for this

16   case -- that they were in contact with the chief of

17   Sedro-Woolley and the prosecutor for Sedro-Woolley.

18   And so I was simultaneously going through a criminal

19   case and a conduct unbecoming investigation.   And the

20   result of that conduct unbecoming investigation was the

21   determination to terminate.

22        Q.   And then ultimately the last chance agreement

23   was because of -- the reason they gave was because of

24   the fueling incident?

25        A.   Correct.

Page 21

10am Armen Beeman - March 10, 2020

1          Q.   So is it fair to say that the April 11th, 2016

2     incident was not the only basis for your termination?

3                    MR. MOODY:   Object to the extent it's

4     calling for a legal conclusion.

5               Answer to the extent you can.

6          A.   I believe that the decision was already made

7     to get rid of me and that they had found a way to

8     terminate me because of the Sedro-Woolley event and

9     then get it enacted without my due process through my

10    union by getting me to sign the last chance agreement.

11              So there was no future as -- as one attorney

12    has told me, the last chance agreement is so flimsily

13    written that I could have filled out some paperwork in

14    blue ink and they could have come to me and said you

15    didn't fill this out in black ink; you're fired.

16              And that's sort of what I'm saying, is what

17    occurred here is that my due -- the last chance

18    agreement was merely to get me to not have due process

19    rights with my union to protect my job from the

20    Sedro-Woolley event.

21         Q.   (By Mr. Parker)   And you voluntarily signed

22    away those -- that union representation, correct?

23         A.   As I said, with the, you know, housing costs

24    and child care costs and things like that, to go from a

25    six-figure income to out of a job, you know, that

Page 22

```
 1    day -- let's -- let's use September 5th as the date
 2    before the last chance agreement was signed.  My
 3    choices were either to be terminated and have no job
 4    and no income and no opportunity to advance in either
 5    federal government employment or law enforcement after
 6    a termination from federal government -- from federal
 7    law enforcement.  And so I -- I wouldn't say free will
 8    was involved at all.  That the pressures of life -- it
 9    was only merely an opportunity to try to preserve my
10    job.
11         Q.   And I understand there were other factors, but
12    you actually did make the choice to sign this document?
13         A.   It's a loose word -- loose use of the word
14    "choice," but yes.
15         Q.   And I -- I don't mean to harp on this, but for
16    instance, you could have made another choice, which it
17    sounds like you would have -- your life would have been
18    harder or that you believed it would have been more
19    difficult, but ultimately you decided that the better
20    choice was to sign this document, and you chose to sign
21    this document?
22         A.   That's correct.
23         Q.   Okay.  Are you suing the border patrol for
24    wrongful termination?
25         A.   I am suing them for wrongful termination, yes.
```

Page 23

10am Armen Beeman - March 10, 2020

1        Q.  And in what court?

2        A.  I believe it's awaiting appointment with a

3  federal judge in the San Francisco area.

4        Q.  Did you tell your supervisors that this arrest

5  occurred -- the April 11th, 2016 arrest occurred?

6        A.  Of course.

7        Q.  Okay.  And how did they respond?

8        A.  As you know from reading the police reports,

9  Officer Shawn Harlan -- or agent -- Supervisory Agent

10  Shawn Harlan came to retrieve the gun.  He was

11  accompanied by another agent.  I spoke with them

12  briefly outside of the Sedro-Woolley police station.

13        They simply let me know that there was a

14  recording of some kind.  And, you know, of course,

15  there was going to be a process, and you know, it was a

16  very calm, casual conversation that I already expected

17  to hear.  So he was not only notified by the Sedro

18  Police, but by myself that very morning.

19        Q.  Okay.  Did you notify them in any other way?

20  Was there some sort of customs and border patrol form

21  you would fill out?

22        A.  I do not believe so.

23        Q.  Okay.

24        A.  I believe they just get the ball rolling at

25  that point.

YOM: Full Service Court Reporting, A Veritext Company
800.831.6973

1      Q.   Do you allege that there was anything improper
2    about the way -- about Sedro-Woolley Police Department
3    personnel providing information to border patrol?
4      A.   That is part of the allegation, yes.   That --
5    that --
6      Q.   And what --
7      A.   Verbal statements by Pat Hayden.   And then a
8    written letter by Chief Lin Tucker -- both after -- at
9    the conclusion of the criminal trial were continuingly
10   detrimental to my conduct unbecoming case with the
11   border patrol.
12     Q.   And Pat Hayden was the prosecutor in this
13   case.   He didn't actually work for Sedro-Woolley Police
14   Department, correct?
15     A.   I'm not sure how the breakdown works.
16     Q.   What are you alleging was improper?
17     A.   One of the comments that Mr. Hayden made was
18   that he believed that the jury was swayed by
19   instructions the judge gave him.   The instructions were
20   the legal and lawful instructions to help them in their
21   determining my case.
22          The way Pat references them makes it sound
23   like maybe they were tricked into their -- maybe that
24   they were tricked into their decision-making.   The
25   border patrol used that phrase -- or the way he phrased

                                             Page 25

10am Armen Beeman - March 10, 2020

1    that to further detrimental -- to further detriment in

2    my conduct unbecoming case.

3            They also referenced the letter from Chief Lin

4    Tucker.   And there are things in law enforcement that

5    are somewhat specific to it -- and you might be

6    familiar with it, but -- the creation of nexus, that --

7    that my arrest somehow negatively impacted the ability

8    of the US Border Patrol to interact with local police

9    departments -- in this case, the Sedro-Woolley Police

10   Department.

11           There was no reason to increase the level of

12   nexus or to believe that there would be any ongoing

13   problems of working together for the rest of the agency

14   or the rest of the agents or even for myself under

15   official conduct doing official duties.   There's no

16   reason for any of it.

17           And after being found criminal -- after being

18   found not guilty resoundingly on a Friday, I believe

19   the date of the letter from Lin Tucker was the

20   following Monday.   So, not only had he already lost the

21   criminal case, he chose to continue to affect my

22   career.

23       Q.   And do you contend that any of the information

24   that the chief gave was false information?

25       A.   I believe it was based on bad information that

Page 26

10am Armen Beeman - March 10, 2020

1    he received from his officers.

2         Q.   But was any of it false?   And I can -- I can

3    rephrase my question slightly.

4         A.   I'd have to reread the letter again.   He -- he

5    made the suggestion that I perhaps not be allowed to

6    keep my job, but if I were, that I not be allowed to

7    enter the City of Sedro-Woolley limits on official duty

8    without being accompanied by somebody else, which would

9    all be detrimental -- or derogatory information in a

10   conduct unbecoming case.

11        Q.   And I understand that what he -- what Chief

12   Tucker may have said was unflattering, but was any of

13   it false?

14        A.   It was grossly misrepresented by the reports

15   of the officers that he was given and the information

16   that he should have been aware of that came out from

17   the case as it approached and went to trial and then

18   went through trial.   It -- it certainly should have

19   never occurred.

20        Q.   Can you tell me every piece of information

21   that you claim the chief conveyed that was bad.

22        A.   As I said, it's detrimental to my job if the

23   border patrol believes that I'm not capable of

24   performing my job.   And if I need accompaniment to go

25   into areas where there's sub -- basically that he's

                                                    Page 27

10am Armen Beeman - March 10, 2020

1    creating the impression that there's a reason why I

2    couldn't continue forward functioning in my job duties

3    as if it had never happened.

4         Q.   And I understand that it was detrimental, but

5    what I'm asking is what was -- what did he -- you're

6    alleging that he said bad things.  What was every --

7    everything he said that was bad?

8         A.   As I said, that I could not enter the City of

9    Sedro-Woolley on official conduct -- on official

10   business without having somebody accompanying me.

11   Like -- and I -- like I said, I would have to reread

12   the letter in order to maybe pick out if there's any

13   other things.  But -- but the purpose of his letter was

14   to continue to have an effect -- a derogatory effect on

15   my position with the border patrol.

16        Q.   Okay.  So, as you sit here --

17        A.   Um-hum.

18        Q.   -- you -- you cannot tell me any information

19   that anyone from the Sedro-Woolley Police Department

20   gave to customs and border patrol that was false?

21        A.   Good parts of the police reports are false.

22        Q.   Okay.  And we'll get into that.  Is -- but as

23   you sit here today, you can't tell me anything that

24   Chief Lin Tucker said that -- and I'm quoting you --

25   pieces of information that were bad?

                                            Page 28

1      A.   It is false that I cannot continue to conduct

2   my law enforcement duties in a professional manner in

3   the City of Sedro-Woolley without having somebody else

4   accompanying me, so that is false.

5      Q.   So that sounds like what you're referencing is

6   a recommendation by Chief Tucker -- not any sort of

7   actual information about you, but something that he was

8   recommending to customs and border patrol?

9      A.   In an attempt to -- that's correct, in an

10  attempt to further harm my status with my employer.

11     Q.   And that's something you believe, correct?

12  Nothing that Chief Tucker ever said to you or was

13  written anywhere?

14     A.   It's pretty obvious.

15     Q.   But my question is did anyone from the

16  Sedro-Woolley Police Department convey that to you?

17     A.   The United States Border Patrol conveyed that

18  to me.

19     Q.   That Sedro-Woolley wanted to adversely affect

20  your employment with customs and border patrol?

21     A.   That they had adversely affected my

22  employment.

23     Q.   Okay.  But my question is did anyone from

24  Sedro-Woolley Police Department ever convey to you that

25  they were attempting or wanted to adversely affect your

Page 29

1    employment with customs and border patrol?

2         A.   Yes, sir.

3         Q.   Okay.   Who?

4         A.   Two persons, Officer Holmberg and Officer

5    Hannawalt.

6         Q.   And what did -- how did they convey that to

7    you?

8         A.   Following my arrest, while I was handcuffed

9    and in the back of Officer Hannawalt's police car,

10   Officer Holmberg was admonishing me for daring to

11   question Officer Hannawalt's activities that night.

12   And one of the things they said was I don't think guys

13   like you should be allowed in -- to work in law

14   enforcement.   And Officer Hannawalt followed that up by

15   saying hopefully this fixes that.

16        Q.   Okay.   You agree that the chief and no one

17   else for the City of Sedro-Woolley had any authority

18   over your job at US -- at customs and border patrol?

19        A.   Anybody who makes a complaint has an effect on

20   another person.

21        Q.   Rather, my question is did they have any

22   authority to fire you?

23        A.   Chief Lin Tucker did not have the authority to

24   fire me, no.

25        Q.   Did any of the individual officers in this

Page 30

10am Armen Beeman - March 10, 2020

1      case?

2          A.   None of them had the authority to fire me.

3          Q.   Did anyone from the City of Sedro-Woolley have

4      any authority over your job at customs and border

5      patrol?

6          A.   Any time a complaint is made, the border

7      patrol investigates the validity of that complaint, and

8      if they find that there is sufficient in -- information

9      to fire an employee, an agent, then that is the

10     outcome.

11         Q.   And I guess you're kind of hitting on my

12     question here, which is customs and border patrol has

13     sole authority over your job with customs and border

14     patrol, correct?

15         A.   Correct.

16         Q.   Okay.  And they investigated the matter?

17         A.   Yes, sir.

18         Q.   And they determined it was valid?

19         A.   Yes, sir.

20         Q.   Okay.  And by -- by the "matter," I mean,

21     the -- everything detailed in the police reports from

22     April 11th, 2016?

23         A.   Yes, sir.

24         Q.   Okay.  So they exercised their own judgment

25     in --

                                                    Page 31

10am Armen Beeman - March 10, 2020

```
 1        A.   Yes, sir.
 2        Q.   Okay.   And ultimately they concluded that the
 3   officers investigated this and that you had acted in
 4   some way inappropriately and that the police reports
 5   were valid?
 6        A.   That was the conclusion they made.
 7        Q.   Okay.   One or two last questions on this
 8   matter.   This happened in April of 2016.   And -- and
 9   you're alleging that the first adverse employment
10   action against you was in September of 2017, correct?
11        A.   That's right.   I apologize.   Like I said, I've
12   made -- I've made this mistake in my head where,
13   because the termination happened in December of the
14   year, I'm sometimes forgetting to go back -- or forward
15   or back that one digit number between 2017, 2018.   So I
16   apologize.
17             This -- this Sedro-Woolley event was April
18   11th, 2016.   I believe it was just before New Year's
19   2018 that I was terminated.   But, again, I don't have
20   my notes with me.   If I had them, I'd -- I'd make sure
21   I was getting those dates accurately.
22        Q.   I understand to a certain extent you're
23   guessing.   That's okay.   Because you do believe that
24   this incident ultimately led to adverse employment, I'm
25   wondering why it took well over a year, possibly over
```

Page 32

1    out.  And it was too late to go replace the headlight.

2         I got down there.  No words were exchanged,

3    nothing like that.  There was no problems.  The

4    gentleman had another beer or two and then left.  Just

5    me being there talking with Kira was enough to keep him

6    quiet over in the other corner.

7         After I had a beer or two, we began talking

8    about how we wanted to play the rest of the night.  I

9    needed to be at an appointment with my divorce attorney

10   in Bellingham the next morning at 10:00 a.m., and she

11   didn't have a need for her vehicle, but they were both

12   parked right down outside of the Bullpen.

13        So she said, well, I still have to work, and

14   you know, I've got a few hours left here, but if you

15   want to keep drinking, I can give you a ride home.  And

16   we'd just go up to her house in Lyman.  And so I said

17   okay.  And had a couple more beers between then and

18   about midnight.

19        She closed the bar down about midnight, and

20   she still had to, you know, wipe down the counters and

21   things like that.  So I helped her with that, you know,

22   moving the chairs around, wiping down the tables while

23   she counted out the money and restocked the bar.

24        And she -- at some point during the evening,

25   she made the comment that after she got off work, she

Page 42

1   would like to go over to Old Timers -- that there was a

2   gal working there that she's friends with that she

3   wanted to pop in and say hi to.  And it would be nice

4   to have a beer with me and just sit down and talk for a

5   few minutes before we went home.

6           So, because I needed my car earlier the next

7   day than she needed her car and she has friends who

8   would be able to pick her up and give her a ride home,

9   we made the conscious decision to drive my vehicle even

10  though the headlight was out.  We left the Bullpen.  We

11  went over to Old Timers.  We drank one Guinness each

12  and then left Old Timers and started driving home

13  towards Lyman.

14          It was on the way home that we passed Officer

15  Hannawalt.  He --

16      Q.  And I'll -- I'll ask about that in just a

17  second.  You just said a lot.  I want to unpack a few

18  things.

19      A.  Okay.

20      Q.  Okay.  So you testified, but -- you knew,

21  while driving down to Sedro-Woolley, that you were

22  driving a vehicle with a headlight out?

23      A.  Correct.

24      Q.  Okay.  Had you been drinking at home prior

25  to --

                                        Page 43

10am Armen Beeman - March 10, 2020

1        A.  No.

2        Q.  Had you taken any narcotics?

3        A.  No, sir.

4        Q.  Okay.  So how many beers do you estimate you

5  had -- or, rather, how many beers did you have before

6  going to Old Timers?

7        A.  In the evening, including the Guinness, I

8  would say, it was between four and five beers.  I don't

9  drink very much, and I don't drink very heavily when I

10  do.  So, you know, the -- the fad nowadays is the

11  microbrews -- you know, all of the tap beers that are

12  tasty.

13        So I -- as I said, I got to the Bullpen

14  after -- about 9:00 -- approximately 9:00 p.m.  I

15  had -- I would say, I had three or four beers there

16  between 9:00 and midnight.  And then -- and then you

17  add the one Guinness that I had over at Old Timers.  It

18  would be four to five.  I don't know if it was four.  I

19  don't know if it was five.  But it was somewhere in

20  that range.

21        Q.  Did you consume any liquor?

22        A.  No, sir.

23        Q.  Okay.  So just those beers?

24        A.  Yes, sir.

25        Q.  Do you smoke marijuana?

Page 44

10am Armen Beeman - March 10, 2020

```
 1          A.   No, sir.

 2          Q.   Or do you ingest it in any way?

 3          A.   No, sir.

 4          Q.   Did you smoke or ingest marijuana on April

 5    10th?

 6          A.   No, sir.  I'm a federal law employee -- I'm

 7    federal law enforcement, and that would be illegal and

 8    a -- immediate cause for termination.

 9          Q.   Did you consider yourself impaired in any way

10    on April 11th when leaving Old Timers?

11          A.   We made the appropriate decision that I had

12    had enough that I shouldn't be driving.

13          Q.   And, sorry, my question was a little

14    different.  Did you consider yourself impaired in any

15    way?

16               MR. MOODY:   Objection to the extent it's

17    calling for a legal conclusion.

18               Again, go ahead and answer.

19          A.   I am not sure what -- I'm not -- I'm not sure

20    when you cross between being sober, having a drink, and

21    becoming impaired to the point where you can't

22    function -- like where that line delineates.

23               So I was not unaware of what was going on

24    around me.  I was capable of making decisions.  I was

25    smart enough not to be behind the wheel of a vehicle.
```

Page 45

1    But whether or not I was impacted by alcohol, I won't

2    deny that I drank four to five beers and whatever

3    effect that might have had on me may have existed.

4         Q.   (By Mr. Parker)  You say it was smart not to

5    drive.  Why was -- why was it smart?

6         A.   Because the potential of getting into a

7    situation with a DUI, especially given -- I think

8    everybody would be well aware of the time of night and

9    a headlight out.  And a headlight is a -- is probable

10   cause to make a vehicle stop.  It's very likely that

11   that could occur.

12        Q.   Do you know if you were intoxicated?

13        A.   As I said, I don't know where that begins or

14   ends.

15        Q.   Do you believe you would have passed a

16   breathalyzer test?

17        A.   I don't know.

18        Q.   I guess, more colloquially, were you buzzed?

19        A.   I definitely felt --

20             MR. MOODY:  I'll object to the form of

21   the question.

22             Go ahead and answer, if you can.

23        A.   I definitely had some feelings of the alcohol,

24   yes.

25        Q.   (By Mr. Parker)  Okay.  And what were those

                                            Page 46

10am Armen Beeman - March 10, 2020

```
 1    feelings?
 2         A.   Just kind of a lowered stress, more carefree.
 3    I -- I really don't know how to describe that, I guess.
 4         Q.   Do you become agitated when you drink?
 5         A.   Not typically, no.
 6         Q.   But it's happened before?
 7         A.   Of course.
 8         Q.   Has anyone ever expressed concern in that
 9    regard?
10         A.   The only person who has ever questioned my
11    drinking was my ex-wife because of the impact it would
12    have on a divorce process.  Other than that, it's never
13    been brought up.
14         Q.   When was the last time you got agitated when
15    you were drinking?
16         A.   Probably April 11th, 2016.  I don't -- again,
17    I don't drink very much.  I don't drink very often, and
18    I don't drink very much when I do.
19         Q.   Okay.  But you were agitated that evening
20    after drinking?
21         A.   After observing what I observed, yes, I became
22    increasingly agitated over the situation.
23         Q.   What did Ms. Syester drink on April 10th and
24    11th?  What alcohol did she drink?
25         A.   One can of Guinness.
```

Page 47

10am Armen Beeman - March 10, 2020

```
 1    want my answer to be anything different than we didn't
 2    talk about it.  So then we just talked about, you know,
 3    it being cold and standing far enough away from your
 4    doors to smoke cigarettes and things like that.
 5         Q.   Thank you.
 6         A.   No problem.
 7         Q.   We appreciate that.  Before Officer Hannawalt
 8    pulled you over, where were you headed?
 9         A.   Home.  To Kira's house.
10         Q.   And why did Kira drive your car and not the
11    other way around?  Why didn't she drive her own
12    vehicle?
13         A.   Because I needed my vehicle to leave the area
14    before 9:00 a.m. where she wouldn't have to do anything
15    involving a vehicle until later in the afternoon, so
16    she had time to recover her vehicle some other way.
17         Q.   Okay.  How long had you been driving before
18    you were pulled over?
19         A.   Couple minutes.
20         Q.   Okay.  Do you agree that the defective
21    headlight is a lawful basis for initiating a traffic
22    stop?
23         A.   Yes, sir.
24         Q.   Okay.  So your -- the initial stop of the
25    vehicle, you agree was lawful?
```

Page 51

10am Armen Beeman - March 10, 2020

1        A.  Yes, sir.

2        Q.  Okay.  As someone who worked in law

3    enforcement, were you aware of any inherent safety

4    risks to police officers that accompany traffic stops?

5        A.  Yes, sir.

6        Q.  What are those risks?

7        A.  Any time you're out on the side of a highway,

8    there's the possibility that another vehicle could come

9    by and a person could be struck.  Things like that.

10   The -- the passengers in the vehicles becoming violent

11   and assaulting an officer, for example.  So there are

12   things that you have to consider.

13       Q.  An occupant could be armed?

14       A.  Yes, sir.

15       Q.  An occupant could try and flee?

16       A.  Yes, sir.

17       Q.  An occupant could try and fight an officer?

18       A.  Yes, sir.

19       Q.  Okay.  Do you agree that at night, it's harder

20   to see inside of a vehicle?

21       A.  Yes, sir.

22       Q.  Do you agree that it's reasonable for a law

23   enforcement officer to be cognizant of these risks when

24   initiating a traffic stop?

25       A.  Of course.  It would be part of the job.

Page 52

1    Q.   Okay.  Do you agree that officers are charged

2    with maintaining control of a traffic stop?

3    A.   Yes, sir.

4    Q.   Okay.  As you were pulling off the side of the

5    road, what did you and Ms. Syester discuss?

6    A.   Obviously it's for the headlight and if he's

7    nice, it will just be, okay, get it fixed.  And

8    otherwise, it could be an infraction for a broken

9    headlight.

10    Q.   Did you discuss the fact that she had just

11    finished drinking alcohol?

12    A.   No.  No, sir.

13    Q.   Were you nervous about that at all?

14    A.   No, sir, not at all.

15    Q.   Once pulled over, what happened?  Once you

16    were pulled over, what happened?

17    A.   Once we were pulled over, Kira rolled down her

18    window.  Officer Hannawalt approached the vehicle,

19    introduced himself, and asked if we knew why -- why we

20    were being stopped.  And, of course, you know, their

21    sheepest (sic) answer of the headlight, you know, was

22    the response that Kira and I probably both gave, you

23    know, sort of, yeah, we know the headlight is out.  We

24    apologize.

25    Q.   Did you announce that you have a service

Page 53

10am Armen Beeman - March 10, 2020

1    weapon?

2         A.   Not at that moment.

3         Q.   When did you announce that you have a service

4    weapon?

5         A.   Officer Hannawalt said, okay, good, as long --

6    something along the lines of, okay, as long as you

7    already knew about it.   And he's like may I see your

8    license, registration, and proof of insurance?   And

9    that -- at that point, Kira said -- I -- I had tried to

10   explain to Kira that because my service weapon was in

11   the vehicle, the phrase she should try to use is for

12   your safety and awareness, my service weapon is in the

13   locked glove box, where the -- the registration and

14   proof of insurance are.   So she said something that was

15   close to that, but not verbatim.

16        And so, when Officer Hannawalt asked for

17   license, registration, proof of insurance, Kira said,

18   okay -- something similar -- but for your safety and

19   awareness, my boyfriend's service weapon is in the

20   locked glove box.   And then he said, okay, then if I

21   could get the documents for, you know, your -- I

22   believe different agencies have different names for

23   them.   We call them credentials, so I'll use that.   But

24   he said can I see your credentials for the -- for the

25   firearm too?

Page 54

10am Armen Beeman - March 10, 2020

1            And so I retrieved my -- my badge and my

2   credentials out of my back pocket.  I handed that to

3   Kira who then handed that and her driver's license to

4   Officer Hannawalt, and he said it was okay to get into

5   the glove box.  So Kira removed the key from the

6   ignition and handed it to me so I could unlock the

7   glove box and get the registration and proof of

8   insurance.

9       Q.  And I'm going to hand you what's been marked

10  as Exhibit 1 -- make sure I'm correct on that.  This is

11  Officer Hannawalt's narrative.

12            MR. PARKER:  And, Counsel . . .

13      Q.  (By Mr. Parker)  The last sentence on the

14  first page here -- on the first paragraph, sorry.

15  Officer Hannawalt says, "While approaching the driver's

16  side door, I saw a female's hand extended out of the

17  window with a driver's license and a gold border patrol

18  agent badge."  Did I read that correctly?

19      A.  Yes, you did.

20            MR. MOODY:  I'm sorry, Counsel, where

21  are you?

22            MR. PARKER:  Sorry, the first paragraph,

23  last sentence.

24            MR. MOODY:  Oh, okay.  Thank you.

25            MR. PARKER:  Yeah.

                                        Page 55

1      Q.   (By Mr. Parker)  It sounds like you -- you --
2  do you disagree with this?
3      A.   Absolutely.  That's just a lie.
4      Q.   And -- and why do you believe he would lie?
5           MR. MOODY:  Object as to speculation as
6  to why somebody might lie.
7           Go ahead and answer, if you have an answer.
8      A.   There are a number of things that Officer
9  Hannawalt did that night that I take issue with.  And
10  part of my concern with what was occurring was that I
11  know that the report writing phase becomes what is
12  referenced and having to undo what he writes is a
13  problem.  I also believe that it's indicative of his
14  report to try to make it as detrimental to my law
15  enforcement career.
16           An act that he describes right there is what
17  we call badging -- using a person's authority to try to
18  get improper preference -- preferential treatment.
19  That in itself is grounds for discipline.  I believe
20  that there are a number of things that are in this
21  report that are in there for no other purpose than to
22  specifically make it harder for me and my conduct
23  unbecoming investigation.  And that's just the first.
24      Q.   (By Mr. Parker)  Okay.  Looking at Hannawalt's
25  report, can you tell me everything in this report that

                                        Page 56

10am Armen Beeman - March 10, 2020

```
1    you think is untruthful.  You can -- you can take time
2    to read it.
3         A.   It -- it would take a while, and there's a
4    lot.
5         Q.   That's okay.
6         A.   As I said, the order that Kira introduced that
7    there was a firearm in the vehicle omits some of the
8    details.
9         Q.   But it's not false?  It -- it could be more
10   complete?  Is that what you're saying?
11        A.   It could more accurately -- accurately reflect
12   that it was a casual vehicle stop for the first several
13   minutes of the vehicle stop.
14        Q.   Okay.
15        A.   Kira was the one who informed Officer
16   Hannawalt that my service weapon was in the locked
17   glove box.
18        Q.   Are you saying you didn't tell Officer
19   Hannawalt that, but Kira did?
20        A.   Correct.
21        Q.   Okay.
22        A.   Officer Hannawalt let us both know he was
23   speaking to us collectively, so . . .  The way he
24   phrases it could be improved.  When an officer wants to
25   write a derogatory report, he can go ahead and
```

                                                Page 57

```
 1    I don't think he got a good enough look at my eyes to
 2    notice whether or not my eyes were watery or not, but
 3    more my admission that, yes, I was the drive -- I was
 4    the passenger of a vehicle for the purpose of not
 5    having a DUI.
 6         Q.  You don't know what he could see and what he
 7    couldn't see, correct?
 8         A.  Just that, generally speaking, in his report,
 9    he tends to side on things that would allow him to
10    include a derogatory impression.
11         Q.  And I understand that, but you don't know what
12    Officer Hannawalt could see or could not see?
13         A.  Okay.
14         Q.  Isn't that a yes?
15         A.  Yes.
16         Q.  Okay.
17         A.  It's a -- might be nitpicky, but for me, his
18    phrase that I got out of the car and stood up tall, I
19    am between 6 foot 2 and 6 foot 3.  I've never heard of
20    anybody standing up short, so I have no idea what
21    standing up tall is.
22              But, again, it's that picture or that painting
23    that he's making that somehow I got out in a way that
24    is -- allows him to be more derogatory in his
25    statement.
```

Page 59

1      Q.   But you admit you got out of the car and stood

2   up, correct?

3      A.   I got out of the car and stood up, correct.

4      Q.   Were you agitated at this point?

5      A.   I was annoyed.

6      Q.   And -- and why were you annoyed?

7      A.   If you look at the sentence before, he says we

8   were going over once again the chain of events during

9   the evening that led up to that point where she was

10   stopped for a burned out headlight.

11          Officer Hannawalt had asked Kira several times

12   about the events of that night while she was inside the

13   car.  Then he asked her to exit the vehicle and go to

14   the back of the car, as he states in his report.  And

15   he continued going over the same questions repeatedly

16   again and again.  And it had gotten to a point where it

17   seemed like a broken record where he couldn't figure

18   out how to get out of the stop, but wouldn't get out of

19   the stop either.

20          Her answers were clear and concise.  She

21   wasn't slurring her speech.  There was nothing

22   inaccurate about her answers.  And he should have been

23   able to draw the conclusion that if she had drank one

24   Guinness beer and was behaving in the way that she had

25   been behaving thus far, there was no reason to continue

Page 60

10am Armen Beeman - March 10, 2020

1    to detain these people.

2          So I exited the vehicle, and I stood up.  I

3    got out calmly and slowly, kept my hands in plain view

4    where he could see them so he had no reason to have

5    concern, and explained to him that he had been

6    detaining us long enough and that there was no need for

7    this to continue; that she had answered him repeatedly.

8          Q.  And have you ever conducted a DUI

9    investigation?

10         A.  During the course of my eight and a half years

11   with the border patrol, I had been present at a number

12   of DUI investigations.  I've never conducted them

13   myself, but I have seen how one goes from probable

14   cause for a vehicle stop to, you know, going through

15   suspicion and articulable facts.

16         So I had seen that before, and I knew that

17   what I was witnessing was not -- not only not correct,

18   because I knew what Kira had done previously, but also

19   that there was something not correct about what was

20   occurring at this stop.

21         Q.  Had you received training on DUI

22   investigations?

23         A.  No.

24         Q.  Okay.  So fair to say you don't know whether

25   or not asking repeated questions is standard DUI

Page 61

10am Armen Beeman - March 10, 2020

1      Q.   Okay.

2      A.   He says he is uncomfortable when Agent Beeman

3  first showed his badge at the beginning of the stop.

4      Q.   Are you on the next page?

5      A.   Yeah.

6      Q.   Okay.

7      A.   And as I said, that's not accurate.  His --

8  pardon me, on the first page, the --

9      Q.   Sorry, you're saying it's inaccurate that he

10 felt uncomfortable?

11     A.   No, that -- that "Agent Beeman first showed

12 his badge at the beginning of the stop," the way he

13 described.  I apologize.  Going back to the first page,

14 the last full paragraph, he gives a shorter version of

15 Kira's answer that it's around 2:00 a.m.  It's a --

16 it's not wrong, but it's introduced in a way that's

17 detrimental to her case and my case.

18     Q.   Okay.

19     A.   My recollection of the events is that Officer

20 Hannawalt did not advise me that I was being detained

21 at the time; that Officer Carroll, who was the one who

22 detained me, placed me in handcuffs and placed me in

23 Officer Hannawalt's vehicle, was the one who -- he was

24 a pleasant fellow.  And was the one who explained to me

25 that, of course, I was just being detained for officer

Page 64

1    safety, which I understand.

2         Q.   And I'll stop you there.   We have a video that

3    kind of kicks in right about here.   So we'll --

4    we'll -- we don't need to go through the rest of the

5    report.

6         A.   Okay.

7         Q.   You just mentioned Officer Carroll --

8              MR. MOODY:   Counsel, he's testified that

9    there were other false --

10             MR. PARKER:   Oh.

11             MR. MOODY:   -- things in the report, so

12   I'd like him to have the opportunity to fully go

13   through the report and explain what his -- he feels to

14   be untruthful.

15        Q.   (By Mr. Parker)   I understand that.   And

16   you're welcome to do so.

17        A.   Okay.   So while Officer Carroll . . .   Again,

18   this is a shortened version of it, but while Officer

19   Carroll was placing me in handcuffs and escorting me to

20   Officer Hannawalt's vehicle, I explained to Kira that

21   what they were doing was trying to find details that

22   had nothing to do with whether she was intoxicated or

23   not; that could simply be used to create articulable

24   facts to continue the way that they were.   And that she

25   needed to stop speaking with them, stop cooperating

Page 65

10am Armen Beeman - March 10, 2020

1        A.   He had already detained us long enough, and it

2   had already gotten way out of hand.   And he had

3   already -- he was telegraphing that Kira was getting a

4   DUI no matter what happened this night.

5        Q.   And you wanted him to stop this investigation?

6        A.   Immediately.

7        Q.   Okay.   Did he listen to you as you told him

8   these things?

9        A.   He -- he listened to me.   He agreed with me

10  about my articulable facts and that he could not

11  continue to articulate why this was a valid DUI stop

12  with the answers that she had given and wanted to

13  continue anyways.

14       Q.   Okay.   So he spoke with you and then went back

15  to Ms. Syester?

16       A.   (Nodding.)

17       Q.   Okay.

18       A.   Yes.

19       Q.   Sorry, that was --

20       A.   Yes.

21       Q.   -- a yes?

22       A.   Yes, sir.

23       Q.   Okay.

24       A.   My understanding after I told Kira that she

25  needed -- that he needed to explain that talking to him

                                                Page 68

1          Q.   Okay.

2          A.   So anyway she -- yeah, she did not complete

3     the test because Officer Hannawalt did not have her

4     complete the test.

5          Q.   But she also didn't complete the test because,

6     in the middle of it, she ran to the vehicle to yell at

7     you, correct?

8          A.   Correct.

9          Q.   Okay.

10         A.   Syester did not follow instructions on blowing

11    into the tube and unit kept indicating insufficient

12    flow.  I attempted several times on my PBT and used

13    Officer Carroll's on one occasion.  And then he says,

14    "Syester blew through her nose on one occasion with my

15    PBT and then properly placed her lips and provided a

16    full breath sample.  The PBT read .142."

17            The video will clearly show that the officers

18    had Kira try several times.  Then they tried several

19    times.  Then they announced that both PBTs were kaput.

20    And then, while the camera was away from Officer

21    Hannawalt and Kira Syester, Officer Hannawalt got it to

22    work.  And she -- and asked her to blow into it one

23    more time.

24            Right before he got that reading of .142, I

25    observed Officer Hannawalt rubbing the -- the tube into

Page 71

10am Armen Beeman - March 10, 2020

1    the palm of his hand.   There was something in the palm

2    of his hand that I could see.

3          And when the -- when this whole event was over

4    and Kira and I were finally back together and after --

5    after I asked her if she was okay and, you know, sorry

6    about the way that the night had gone, I asked her --

7    the first thing I asked her was what was in his hand

8    when he -- right before he had you blow on that reading

9    that tested, and she explained to me that because both

10   herself and both of the officers had been blowing into

11   it, that he wiped it with something to clean the tube

12   so as not to spread germs.

13        Q.   And earlier you put quotes over "got it to

14   work."   What -- why did you put quotes over that?

15        A.   I think anybody who watches that video will

16   look at it and go this stop was grossly incompetent.

17   That having two portable breath testers tried by three

18   different persons and the acknowledgement that they

19   weren't working and then magically on a last one, there

20   it is.   That's the one we're going with.   I think

21   anybody would have a problem with that.   I think any

22   Court would have a problem with that.

23        Q.   Do you dispute that he cleaned the PBT?

24        A.   No.   I believe he did with a wipe that

25   contained alcohol, as most disinfecting wipes do, in

Page 72

10am Armen Beeman - March 10, 2020

```
 1   order to prevent the spread of germs between himself
 2   and Officer Carroll and Kira, and gave it back to her
 3   with a recently wiped with disinfectant wipe that may
 4   have caused a reading, if that thing was accurate at
 5   all after being announced kaput.
 6          Q.   Do you have any knowledge or training on how
 7   to work a PBT?  And to be clear, these -- I'm referring
 8   to a portable breath -- portable breathalyzer test.
 9          A.   I have some familiar -- personal familiarity
10   with them.  And I'm aware that there are things besides
11   alcohol that can cause false positives.
12          Q.   Do you have any knowledge as to whether or not
13   a wipe would cause a false reading?
14          A.   I can't say for sure.
15          Q.   So you don't have any knowledge?
16          A.   I know that breath spray, breath wash, breath
17   mints, gum, other things can and do.  And I have no
18   reason to believe that a disinfectant alcoholic wipe
19   would.  If you're asking me whether I would trust it, I
20   absolutely would not.  I mean, anybody would be an
21   idiot to blow into a -- a breathalyzer test that had
22   just been wiped with something.
23          Q.   And, again, my question was a little
24   different.  I asked if you have any knowledge, not a
25   belief, as to whether or not a wipe could cause a false
```

Page 73

10am Armen Beeman - March 10, 2020

1    reading?

2        A.   No.

3        Q.   Okay.  Do you have any knowledge that it would

4    cause a false reading of .142?

5        A.   When I observed it occurring, where they were

6    demonstrating false positives, it would read anything

7    all over, up and down the scale.  It could be a

8    mouthful of Listerine right after that would send it

9    off the charts.  Chewing gum would be less.

10       Q.   And do you have any firsthand knowledge as to

11   what Officer Hannawalt actually did to the PBT?

12       A.   He wiped it with something.

13       Q.   Okay.

14       A.   And doesn't reference it in his report at all.

15       Q.   Okay.  Do you know if Ms. Syester ever

16   challenged the validity of that PBT test in her -- in

17   her case?

18       A.   No.  Because of the way that criminal

19   proceedings work and personal pressures, it never

20   became an item of issue.

21       Q.   So she did not challenge the validity of a

22   .142 reading?

23       A.   Challenging it became -- never became an item

24   of issue.

25       Q.   Okay.  So she didn't?

Page 74

1        A.   On her lawyer's advice, she did not, no.

2        Q.   Okay.  And you can keep going.  I think you're

3   on the very last paragraph of the -- of 51.

4        A.   I won't say the last page of this is lies, but

5   again, they're brief as -- and leave out a considerable

6   amount.

7        Q.   Okay.  You can keep that.

8        A.   Okay.

9        Q.   So we, at length, just went through Officer

10   Hannawalt's report.  Is there anything else in here

11   that you take issue with that you think is a

12   misrepresentation besides what you've enumerated?

13        A.   Yeah.  Yes.

14        Q.   Okay.

15        A.   Officer Holmberg arrived at the scene --

16              MR. MOODY:  Where are you at, Mr. --

17        A.   The final paragraph where he says that

18   officer -- or final page, top paragraph, he doesn't put

19   in there that I asked Officer Holmberg about redoing

20   the traffic stop with Kira because Officer Hannawalt

21   had, in my opinion, performed a biased DUI stop.  He

22   told me he wouldn't do that.

23              That it doesn't reflect any of the

24   conversations between myself and Officer Holmberg.  It

25   doesn't reflect the conversation that existed after the

                                        Page 75

1   $10,000, you know, in order to go through the process.

2   And attorneys -- you know, in this case, an attorney

3   was $6,500.  To get the car out of impound was $450.

4   The expenses over an allegation as -- as unsettling as

5   this whole fiasco, just my annoyance with -- with the

6   situation.

7        Q.  And I'm quoting here.  Did you say -- and I'm

8   quoting -- for fuck's sake, knock it off?

9        A.  Yeah.

10        Q.  Okay.  And what are you asking him to knock

11   off?

12        A.  He's arresting a woman who is not drunk.  He

13   is arresting a woman who is legally within her right to

14   drive from where we were to our house.  I'm -- it's all

15   of that.

16        Q.  You want him -- them to stop this

17   investigation?

18        A.  That, from beginning to end, was my intent,

19   was for somebody other than Officer Hannawalt to take

20   over the investigation, because Officer Hannawalt was

21   dead set on I've pulled you over for a headlight

22   infraction and, whatever his reasons are, Kira was

23   going to get a DUI that night.  And as I said, he was

24   telegraphing his intentions.

25        Q.  And his -- and earlier you said that was my

Page 94

10am Armen Beeman - March 10, 2020

1    intent.   It was your intent to stop this investigation?

2        A.   To have another officer do the investigation.

3        Q.   And -- and for Officer Hannawalt to stop his

4    investigation?

5        A.   Yes, sir.

6                MR. PARKER:   Okay.   Continuing playing

7    at minute 43.

8                (Video playing.)

9                MR. PARKER:   I'm stopping that at minute

10   one -- one minute, 14 seconds.

11       Q.   (By Mr. Parker)  Listening to this video and

12   what little bit you can see of yourself, do you believe

13   you were -- are intoxicated?

14       A.   Again, I don't know how to answer that

15   question.   Made the right choice to not be driving.   I

16   was definitely feeling the effects, but whether I --

17   but I was definitely able to process what was going on

18   around.   I was definitely -- you know, like I said, I

19   stayed on point with my comments that I was yelling.

20            I never directed insults at the officers.   I

21   never threatened the officers.   I never did anything

22   other than stick to where is the supervisor, you know,

23   where -- she has an attorney.

24            So it's a question that can't be answered

25   other than, yes, I had consumed alcohol, but more or

                                      Page 95

10am Armen Beeman - March 10, 2020

1              REPORTER'S CERTIFICATE

2         I, MINDI L. PETTIT, the undersigned Certified

3    Court Reporter pursuant to RCW 5.28.010 authorized to

4    administer oaths and affirmations in and for the State

5    of Washington, do hereby certify that the sworn

6    testimony and/or proceedings, a transcript of which is

7    attached, was given before me at the time and place

8    stated therein; that any and/or all witness(es) were

9    duly sworn to testify to the truth; that the sworn

10   testimony and/or proceedings were by me

11   stenographically recorded and transcribed under my

12   supervision, to the best of my ability; that the

13   foregoing transcript contains a full, true, and

14   accurate record of all the sworn testimony and/or

15   proceedings given and occurring at the time and place

16   stated in the transcript; that a review of which was

17   requested; that I am in no way related to any party to

18   the matter, nor to any counsel, nor do I have any

19   financial interest in the event of the cause.

20        WITNESS MY HAND AND DIGITAL SIGNATURE this 19th

21   day of March 2020.

22

23

24   MINDI L. PETTIT

     Washington State Certified Court Reporter, #2519

25   mindi.pettit.courtreporter@comcast.net

                                        Page 128

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.